# THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **PAMELA HOWARD,** 7141 Phillipsburg-Union Road Brookville, OH 45309 | : : : : : | |
| Plaintiff, | : : | Case No.: 3:21-cv-85 |
| v. | : : : : | Judge |
| **DM TOOL & PLASTICS, INC.,** 4140 U.S. Route 40 East Lewisburg, OH 45338 | : : : : | COMPLAINT |
| Defendant. | : : : | Jury Demand Endorsed Herein |

NOW COMES Plaintiff Pamela Howard ("Plaintiff") and proffers this Complaint for damages against Defendant DM Tool & Plastics, Inc. ("Defendant").

## THE PARTIES

1. Plaintiff Pamela Howard is a natural person residing in Ohio.

2. Defendant DM Tool & Plastics, Inc., is a Corporation for Profit doing business in the Southern District of Ohio.

3. At all times relevant herein, Plaintiff was an "employee" as that term is defined under the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008 (together, "the ADA") and O.R.C. Chapter 4112 *et seq.*

4. Defendant is an "employer" as defined by the ADA and O.R.C. Chapter 4112 *et seq.*

## JURISDICTION AND VENUE

5. This action is brought pursuant to the ADA and O.R.C. § 4112 *et seq.*

6. Jurisdiction is conferred upon this Court by 28 U.S.C § 1331, which provides for original jurisdiction of Plaintiff's claims arising under the law of the United States.

7. This Court has jurisdiction over Plaintiff's claims under the statutory law of Ohio pursuant to supplemental jurisdiction as codified at 28 U.S.C § 1367.

8. This Court has jurisdiction over Plaintiff's claim under the ADA, as Plaintiff has exhausted all administrative remedies and received a Right to Sue Letter with a mailing date of December 10, 2020.

9. Venue is proper pursuant to 28 U.S.C § 1391 because Plaintiff entered an employment relationship with Defendant in the Southern District of Ohio and performed her job duties there, and Defendant is doing and has done substantial business in the Southern District of Ohio.

## FACTUAL BACKGROUND

10. Plaintiff began working for Defendant as a Quality Inspector in or around July 2018.

11. Plaintiff's job duties consisted of walking the floor of the shop and taking samples from the CNCs in order to test the parts they produced.

12. Plaintiff was also responsible for conducting "first piece" sampling, which consisted of testing the parts produced by a recent setup machine prior to that machine running a full production.

13. Plaintiff received positive feedback regarding her performance from her direct supervisor, Jeff Besecker (Quality Manager), and other members of management at Defendant.

14. Plaintiff began experiencing irritation issues with her eyes.

15. Plaintiff's eyes felt dry and she felt dizzy during the first 14-months of her employment at Defendant.

16. Plaintiff alleviated her symptoms by leaving Defendant's facilities to briefly get some fresh air.

17. On or about October 9, 2019, Plaintiff developed a rash on her skin and her eyes became extremely swollen.

18. Plaintiff visited her medical provider at Phillipsburg Family Care as a result.

19. Plaintiff's medical provider diagnosed her with "unspecified contact dermatitis type, unspecified trigger."

20. Plaintiff's medical provider asked her during the medical examination if anything either in Plaintiff's home or work environment recently changed.

21. Plaintiff responded by stating nothing in her home environment changed, but her work environment changed consistently due to new chemicals being used.

22. Plaintiff was advised by her medical provider to monitor any changes in her work environment, including any new chemicals she came into contact with.

23. Plaintiff was prescribed prednisone to help deal with her allergic reactions.

24. Plaintiff was also taken off work until on or about October 24, 2019. Plaintiff's medical provider indicated Plaintiff would have no restrictions or limitations upon her return to work.

25. Consistent with her medical provider's direction, Plaintiff began paying greater attention to the chemicals Defendant used.

26. Plaintiff identified one chemical used by Defendant, Gentech.

27. Defendant's employees used Gentech to rinse and soak machine parts.

28. Defendant had recently replaced the container of Gentech as it likely became diluted over time as a result of machine parts being rinsed and soaked over time.

29. The Gentech container was located approximately 20-feet from Plaintiff's desk.

30. On or about November 18, 2019, Plaintiff inquired with Becky Adler, Warehouse Manager, for the SDS sheets for the chemicals Defendant used to determine relevant information (e.g., toxicological information and properties).

31. Ms. Adler was responsible for filing the SDS sheets.

32. Once locating the specific SDS sheets, Plaintiff asked Ms. Adler if she could print the sheets, to which Ms. Adler responded "no."

33. Ms. Adler told Plaintiff she could only hand-write any information she wanted from the SDS sheets.

34. Plaintiff wrote down a few pieces of information and returned back to her work.

35. On or about November 21, 2019, Plaintiff developed another red rash on her neck and her eyes became swollen again.

36. Plaintiff returned to her medical provider that day as a result.

37. Plaintiff's medical provider provided the same diagnosis for Plaintiff's reactions, "unspecified contact dermatitis type."

38. Plaintiff's medical provider continued to provide the prescription prednisone and took her off work until on or about December 2, 2019.

39. Plaintiff's medical provider indicated Plaintiff could return to work on or about December 2, 2019, without any restrictions.

40. On or about December 2, 2019, Plaintiff retuned to work.

41. On or about December 6, 2019, Defendant's Human Resources Manager, Kari Morgan, requested Plaintiff to come to her office for a meeting.

42. Ms. Morgan asked Plaintiff why she supposedly had a "bad attitude."

43. Ms. Morgan further stated to Plaintiff, "you're spreading a bad attitude to other works," identifying situations in which Plaintiff had recently asked other employees about pay and bonuses.

44. Plaintiff responded to Ms. Morgan's accusation stating she did not believe she demonstrated a bad attitude at work, and that she had asked other employees about the bonus payments because she did not receive one for the Thanksgiving holiday unlike the other employees.

45. Ms. Morgan responded to Plaintiff stating Plaintiff did not "need any information on that because bonuses are never guaranteed."

46. Plaintiff responded by stating that she had concerns about Defendant's employee Tristin Leffler given that he worked on heavy machinery high on marijuana. Plaintiff further spoke with Ms. Morgan about her desire to identify what triggered her contact dermatitis.

47. Ms. Morgan concluded the meeting telling Plaintiff, "you need to go home this weekend and decide wither or not you want to work at [Defendant]."

48. Plaintiff returned to work after the weekend and worked that week without incident.

49. Plaintiff experienced some dryness in her eyes and some skin irritation, but it did not compare to what she had previously experienced that required her to take off work.

50. Plaintiff took a picture of the Gentech chemical label given that Ms. Adler did not allow her to print the SDS sheets.

51. On or about Friday, December 12, 2019, Ms. Morgan commented to Plaintiff about witnessing some red spots on Plaintiff's neck.

52. Plaintiff responded by stating she was monitoring it to make sure there was no swelling.

53. Later that day, Ms. Morgan approached Plaintiff on the shop floor and asked to speak with her away from Defendant's other employees.

54. Once alone, Ms. Morgan began the conversation with Plaintiff expressing her concern for the red spots on Plaintiff's neck.

55. Ms. Morgan went on to tell Plaintiff that, "until we can pinpoint" what was triggering Plaintiff's skin irritation, Defendant could not have her working at the company.

56. Ms. Morgan further stated that Defendant needed a doctor's note before Plaintiff could return back to work.

57. Plaintiff responded to Ms. Morgan stating that her medical provider had not been able to determine what caused Plaintiff's contact dermatitis, hence the diagnosis of "unspecified contact dermatitis."

58. Once again, Ms. Morgan stated that Plaintiff could not return to work "until we can pinpoint" the cause through a doctor's note.

59. Ms. Morgan forced Plaintiff to leave work that day.

60. Plaintiff went to her medical provider that day and informed her medical provider about Defendant's requirement for her to return back to work.

61. The medical provider was confused by Defendant's decision to force Plaintiff on leave given, among other reasons, the medical provider had provided her a return-to-work form ten days prior with no restrictions.

62. The medical provider did not know what triggered Plaintiff's contact dermatitis, and therefore did not know how to "pinpoint" the cause to comply with Defendant's request.

63. On or about December 18, 2019, Plaintiff provided a hand-written letter to Defendant, "requiring a detailed explanation as to why [Plaintiff] was sent home from work on Thursday December 12, 2019 and told that [Plaintiff] could not return without a Dr. note w/ explanation of exactly what is causing [Plaintiff's] redness of neck & eyes."

64. Plaintiff also provided another hand-written letter that day requesting Defendant to provide her a list and copy of all chemicals she could have been exposed to during her employment.

65. Two days later, Plaintiff clarified her latter request by asking for the SDS sheet for every chemical used in the CNC and Inspection Areas.

66. Plaintiff provided these requests attempting to fulfill Defendant's request that her medical provider "pinpoint" the cause of her contact dermatitis.

67. Ms. Morgan wrote a letter to Plaintiff dated December 20, 2019, responding, "[t]o be clear, we have not requested that your doctor provide an 'explanation of exactly what is causing [Plaintiff's] redness of neck and eyes.'"

68. Ms. Morgan further stated in her letter that Defendant "placed [Plaintiff] on leave of absence until [Defendant] can get assurance from [Plaintiff's] doctor that it is safe for [Plaintiff] to return."

69. Defendant indicated that it based its decision to place Plaintiff on leave of absence based on Plaintiff's claim that she "suspect[ed] something at work is causing [Plaintiff's] skin to react badly, perhaps because of an allergy."

70. Plaintiff obtained more medical documentation from her medical provider in or around January 2020.

71. The medical documentation Plaintiff obtained outlined the care the medical provider had provided and included Plaintiff's diagnosed condition of contact dermatitis.

72. The medical documentation reiterated the fact that Plaintiff's medical provider could not identify the source of Plaintiff's allergic reaction given that she worked with several unknown chemicals.

73. Plaintiff's medical documentation showed her medical provider that provided her two different return-to-work notes without restrictions or limitations.

74. Plaintiff presented that note to Defendant on or about January 14, 2020.

75. On or about January 20, 2020, Plaintiff attempted to return to work because she physically felt fine.

76. Plaintiff returned to Defendant's facility and began performing her regular job functions.

77. About an hour later, Justin Bennett came to Plaintiff and told her she needed to meet with him and Ms. Morgan in Ms. Morgan's office.

78. During the meeting, Ms. Morgan claimed Plaintiff's medical documentation was insufficient, stating it did not address December 12, 2019.

79. Ms. Morgan informed Plaintiff to leave Defendant's facilities.

80. In a letter post-marked January 21, 2020, Ms. Morgan stated that the medical documentation Plaintiff provided was insufficient on the grounds that it, "fails to address the health concern [Plaintiff] subsequently raised on December 12, 2019, before being placed on leave."

81. Ms. Morgan further stated that, "[a]s [Defendant] stated at that time, [Defendants] still need current medical documentation that it is safe for [Plaintiff] to return to the job without posing a health risk to [Plaintiff] or others."

82. Oddly, Ms. Morgan's letter was dated January 16, 2020, yet the post-marked date was January 21, 2020.

83. Plaintiff saw her medical provider for the sole purpose of being evaluated and having her medical provider indicate once again that Plaintiff was able to return to her position without restrictions.

84. On or about February 6, 2020, Plaintiff's counsel sent a letter to Defendant explaining how Defendant's decision to unilaterally place Plaintiff on unpaid leave violated Plaintiff's rights under the ADA.

85. Plaintiff returned to work on or about February 10, 2020.

86. On or around April 6, 2020, Defendant terminated Plaintiff's employment claiming they had made the decision due to the economic impact of COVID-19.

87. At the time of her termination, Plaintiff believed she was the only person Defendant terminated.

88. Defendant continued to operate under the stay-at-home order due to Defendant being an "essential business."

## FIRST CAUSE OF ACTION
### Disability Discrimination (Unlawful Termination)
### ADA & O.R.C. § 4112, *et seq.*

89. Plaintiff reasserts and reincorporates all allegations in the paragraphs as if fully rewritten herein.

90. Plaintiff was seen by her medical provider and diagnosed with unspecified contact dermatitis type. At all times relevant hereto, Plaintiff had a disability, a record of physical impairments, and was regarded by Defendant as having a physical impairment as defined by the ADA and O.R.C. § 4112.01(A)(13).

91. Plaintiff was qualified because she could perform the essential job functions of her position with or without a reasonable accommodation. Furthermore, Plaintiff performed her job successfully and received positive feedback.

92. Defendant's decision to terminate Plaintiff was casually connected to Plaintiff's disability because, among other reasons: (1) Defendant's Human Resources Manager, Ms. Morgan, placed Plaintiff on unpaid leave on December 12, 2019, because of Plaintiff's disability and did not allow Plaintiff to return to work, and Plaintiff was not allowed to return until on or about February 10, 2020; (2) Plaintiff's medical provider provided two notes that Plaintiff could return to work without restrictions; (3) Plaintiff provided Defendant her medical documentation, but Ms. Morgan regarded the documentation as "insufficient"; and (4) Defendant only terminated Plaintiff's employment during the global pandemic yet continued to operate as an essential business.

93. Plaintiff will be able to establish that any allegedly legitimate reason for her termination was a pretext of discrimination.

94. Defendant acted with malice or reckless indifference to Plaintiff's rights under state and federal law.

95. As a result of Defendant's unlawful actions, Plaintiff has been damaged.

**SECOND CAUSE OF ACTION**
**Disability Discrimination (Forced Unpaid Leave)**
**ADA & O.R.C. § 4112,** *et seq.*

96. Plaintiff reasserts and reincorporates all allegations in the paragraphs as if fully rewritten herein.

97. Plaintiff was seen by her medical provider and diagnosed with unspecified contact dermatitis type. At all times relevant hereto, Plaintiff had a disability, a record of physical impairments, and was regarded by Defendant as having a physical impairment as defined by the ADA and O.R.C. § 4112.01(A)(13).

98. Plaintiff was qualified because she could perform the essential job functions of her position with or without a reasonable accommodation. Furthermore, Plaintiff performed her job successfully and received positive feedback.

99. Defendant discriminated against Plaintiff for her disability by forcing her to take unpaid leave despite her doctor's notes returning her to work without limitations or restrictions. Defendant forced Plaintiff to take unpaid leave regarding her as a "direct threat to herself and others" on or about December 12, 2019, and Defendant did not allow Plaintiff to return back to work until on or about February 10, 2020.

100. Ten days prior to Defendant mandating Plaintiff to take unpaid leave, Plaintiff's medical provider provided Defendant a note returning Plaintiff to work without any restrictions or limitations. Defendant mandated that Plaintiff take unpaid leave because Defendant regarded her as a "direct threat to herself and others." Defendant did not properly engage in the proper assessment as to whether or not Plaintiff posed a direct threat to herself or others. Instead, Defendant completely disregarded Plaintiff's doctor's notes and forced her to take unpaid leave.

101. Therefore, Defendant unlawfully placed Plaintiff on unpaid leave in violation of the ADA and O.R.C. 4112 *et seq*.

102. Plaintiff will be able to establish that any allegedly legitimate reason for her termination was a pretext of discrimination.

103. Defendant acted with malice or reckless indifference to Plaintiff's rights under state and federal law.

104. As a result of Defendant's unlawful actions, Plaintiff has been damaged.

## THIRD CAUSE OF ACTION
### Retaliation
### ADA & O.R.C. § 4112, *et seq.*

105. Plaintiff reasserts and reincorporates all allegations in the paragraphs as if fully rewritten herein.

106. Plaintiff was seen by her medical provider and diagnosed with unspecified contact dermatitis type. At all times relevant hereto, Plaintiff had a disability, a record of physical impairments, and was regarded by Defendant as having a physical impairment as defined by the ADA and O.R.C. § 4112.01(A)(13).

107. Plaintiff was qualified because she could perform the essential job functions of her position with or without a reasonable accommodation. Furthermore, Plaintiff performed her job successfully and received positive feedback.

108. Plaintiff engaged in protected conduct when she requested Defendant to provide SDS sheets of the chemicals it used to "pinpoint" the cause of her disability. Despite Plaintiff engaging in this protected conduct, Plaintiff suffered an adverse employment action when Defendant placed her on forced, unpaid leave following her request for SDS sheets.

109. Plaintiff further engaged in protected conduct when her undersigned counsel sent a demand letter on or about February 6, 2020, to Defendant explaining how Defendant's decision to unilaterally place her on unpaid leave violated her rights under the ADA and O.R.C. Chapter 4112 *et seq*. Despite Plaintiff engaging in this produced conduct, Plaintiff suffered an adverse employment action when Defendant terminated her employment on or about April 6, 2020.

110. Defendant lacked good faith and/or reasonable grounds to believe that it had not violated the ADA and O.R.C. Chapter 4112 *et seq.*, in its decision to place Plaintiff on forced, unpaid leave, and, ultimately, its decision to terminate Plaintiff's employment.

111. As a result of Defendant's unlawful and retaliatory actions, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands for all Counts, monetary damages including back pay and benefits, statutory liquidated damages, expert witness fees and attorneys' fees and costs, front pay, and compensatory damages in an amount to be determined at trial, but in any event not less than $75,000.00 and any and all other relief, which this Court deems just and appropriate.

Respectfully submitted,

/s/ Bradley L. Gibson
Bradley L. Gibson (0085196)
**GIBSON LAW, LLC**
9200 Montgomery Road, Suite 11A
Cincinnati, OH 45242
brad@gibsonemploymentlaw.com
[T]: 513.834.8254
[F]: 513.834.8253

*Attorney for Plaintiff*

## JURY DEMAND

Plaintiff hereby requests a jury of at least eight (8) persons.

>/s/ Bradley L. Gibson
>Bradley L. Gibson (0085196)